**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KYLE ROCHE<br><br>    Plaintiff,<br><br>  v.<br><br>330 Wythe Avenue Associates, L.L.C., Paul<br>Eisenberg, And Stephanie Eisenberg<br><br><br>    Defendants. | Civ. No. _____ |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff Kyle Roche, individually and on behalf of all others similarly situated, brings this action against 330 Wythe Avenue Associates L.L.C. ("Wythe Associates"), Paul Eisenberg, and Stephanie Eisenberg (collectively "Defendants") and alleges as follows:

## I.    INTRODUCTION

1.    This action is brought on behalf of all persons who purchased condominium units in The Esquire Building located at 330 Wythe Avenue, Brooklyn, New York from November 20, 2001 to present (the "Class Period").

2.    Plaintiff seeks relief for the injuries sustained by class members resulting from Defendants' misrepresentations, omissions, and systematic breaches of statutory, contractual, and fiduciary obligations arising from their conversion, marketing, and management of the condominium known as "The Esquire Building." These include, but are not limited to, Defendants' failure to secure a Permanent Certificate of Occupancy ("PCO") for over two decades in violation of their obligations under the Offering Plan; their unlawful withdrawal of purchaser funds from escrow accounts; and their concealment of structural and regulatory barriers to obtaining a PCO.

3.    Accordingly, Plaintiff claims common law breach of contract under the Offering Plan and Purchase Agreements, common law fraud, breach of fiduciary duties, and unjust enrichment. As a direct result of Defendants' conduct, class members have suffered substantial damages including, but not limited to: (a) loss of lawful occupancy rights; (b) devaluation of their units, including those who have sold their units and suppressed prices; (c) loss of rental income; (d) inflated interest rates on mortgages due to banks charging more given the legal status of the Esquire Building; (e) out-of-pocket costs for regulatory compliance and halted construction; (f) issuance of stop work orders and exposure to legal liabilities; (g) diminished utility, habitability, and marketability of their property; and (h) increased cost of insurance.

4.      Plaintiff asserts claims for breach of contract, fraud, breach of fiduciary duty, and unjust enrichment. Plaintiff and the class members seek compensatory and punitive damages, disgorgement, equitable relief including injunctive and declaratory remedies, and all other relief the Court deems just and proper.

## II.     PARTIES

### a.  Plaintiff

5.      Plaintiff Kyle Roche is a United States citizen whose residence is Miami Beach, Florida. Roche owns a residential condominium unit in the Esquire Building. Roche purchased the condominium unit in March 2021. Through the deed effectutating his purchase, Roche acquired "all right[s]" that the original purchaser of the condominium unit had under the Offering Plan prepared by the Defendants in 2001 (the "Offering Plan," attached as Exhibit A), including the right enforce against the Wythe Associates for its obligations to obtain a PCO for the Esquire Building.

6.      In November 2024, Roche began renovations on his condominium unit, including necessary electrical and plumbing work. In early 2025, these construction efforts were shutdown by the New York City Department of Buildings. When efforts were made to obtain the necessary permits to restart work, the NYC Department of Buildings refused to issue permits due, in part, to the lack of a PCO. As a result, Roche's condominium unit is now unhabitable.

### b.  Defendants

7.      Defendant 330 Wythe Avenue Associates, LLC, ("Wythe Associates") is a New York limited liability company with its principal place of business in New York, New York. Wythe Associates is the sponsor of the Esquire Building, a condominium located at 330 Wythe Avenue in Brooklyn, New York. In September 2000, Wythe Associates commenced the conversion of the building, a pre-war shoe polish factory, into a condominium. In July 2001, Wythe Associates

3

began to offer units for sale to the public. All members of 330 Wythe Avenue Associates, LLC are citizens of New York.

8.      Defendant Paul Eisenberg is a citizen and resident of the State of New York. At all relevant times, Paul Eisenberg has been a principal, member, and controlling person of Wythe Associates.

9.      Defendant Stephanie Eisenberg is a citizen and resident of the State of New York. At all relevant times, Stephanie Eisenberg has been a principal, member, and controlling person of Wythe Associates.

## III.    JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the Plaintiff and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendant Wythe Associates is a New York limited liability company incorporated in this district and the events or omissions giving rise to Plaintiff's claims occurred in this district. Venue is also proper as to Defendants Paul and Stephanie Eisenberg because they are citizen and residents of Kings County New York.

12.     Personal jurisdiction is proper in this Court because Defendant Wythe Associates, a New York limited liability company, is incorporated and principally conducts business in New York. Venue is also proper as to Defendants Paul and Stephanie Eisenberg because they are citizens of New York.

4

## IV.    FACTUAL ALLEGATIONS

### a.    The Esquire Building and Offering Plan

13.    The Esquire Building is a former pre-war shoe polish factory located at 330 Wythe Avenue in Brooklyn, New York. Wythe Associates acquired the property in 1983 and began converting it into a mixed-use condominium building in 2000.

14.    Around this time, Wythe Associates obtained financing to rehabilitate the Esquire Building into a mixed-use building consisting of seventy-five (75) residential units, one (1) residential penthouse unit, and two (2) commercial units.

15.    Pursuant to the Offering Plan, Wythe Associates began selling condominium units to the public and had accepted eighteen (18) purchase agreements by August 27, 2001.

16.    On October 31, 2001, the Building obtained its first Temporary Certificate of Occupancy ("TCO") from the Department of Buildings ("DOB"). *See* Exhibit B, Eighth Amendment to Offering Plan, Jan. 17, 2003.

17.    On November 20, 2001, Wythe Associates closed on the sale of the first condominium unit (the "First Unit Closing").

18.    The Offering Plan was amended eight times between August 3, 2001, and January 17, 2003. None of these amendments alter the rights asserted in this Action by Roche or the class members under the Offering Plan.

### b.    Defendants' Obligations Under the Offering Plan

#### i.    Obligations to Obtain a Certificate of Occupancy

19.    Pursuant to N.Y. Mult. Resid. Law §§ 301 and 302, multiple dwelling buildings in New York City are required to obtain a certificate of occupancy from the NYC Department of Buildings ("DOB") before any dwelling unit can be legally occupied.

5

20.    In general, the DOB issues two types of certificates: a temporary certificate of occupancy ("TCO") and a permanent certificate of occupancy ("PCO").

21.    In general, a TCO may be granted when a building is safe to occupy and can be maintained without posing a risk to public health, safety, or welfare. A PCO, on the other hand, is issued once construction is complete and the building substantially conforms to the plans approved by the DOB. To obtain a PCO, the applicant must certify that the construction complies with the approved documents and meets all applicable laws and regulations.

22.    The Offering Plan places strict requirements on Wythe Associates to obtain both a TCO and eventually a PCO for the Building. Specifically, the Offering Plan states:

> Prior to the First Unit Closing under this Plan, Sponsor shall have obtained at least a temporary certificate of occupancy covering the Unit to be closed. **If Sponsor has closed title to the first Unit on a temporary certificate of occupancy, Sponsor shall attempt to obtain a permanent certificate of occupancy within two (2) years after closing of title to the first Unit,** subject, however, to construction delays caused by weather, strikes, lockouts, acts of god, shortages of or inability to obtain, materials, equipment or labor, governmental restrictions or preemption, damage by fire or the elements, actions by Unit Owners or tenants of Unit Owners, or any other cause over which Sponsor has no control, **but in any event, before expiration of applicable temporary certificate of occupancy, as same may be renewed, replaced or extended**.

Ex. A at 65 (emphasis added).

23.    This sequencing required Wythe Associates to do the following: (1) acquire a TCO prior to the first closing of the sale of any unit; (2) attempt to obtain a PCO within two (2) years after closing of the first unit unless events outside of its control prevented it from doing so; and (3) requiring Wythe Associates, *with no exceptions*, to have obtained the PCO before the expiration of the TCO.

24.     This provided certain protections to individuals buying units in the Building. Essentially, this provision guarantees that Wythe Associates has an obligation to first obtain the TCO and then to keep the TCO in place for as long as necessary to obtain the PCO for the Building.

25.     Pursuant to the Offering Plan, Wythe Associates initially "anticipated" that by June 2001 it would secure a TCO for the Building and by September 2001, it would secure a PCO. *See* Ex. A at 7. On January 17, 2003, Wythe Associates amended the Offering Plan to state, "[t]he projected date that the Permanent Certificate of Occupancy will be obtained by the Sponsor is 2/15/2003." *See* Ex. B.

## ii.   Obligations to Fund a PCO Escrow Account

26.     Under both the Offering Plan and New York law, Wythe Associates was obligated to keep 10% of all funds received for the sale of any and all units in an escrow account until it obtained a PCO for the building.

27.     Specifically, the Offering Plan provides:

"In the event any closing of title to a Unit occurs after issuance of a temporary certificate of occupancy covering the Unit but before the issuance of a permanent Certificate of Occupancy covering the Unit, all deposits and funds in escrow received from the Purchaser of said Unit shall continue to be held in the Escrow Account, unless Sponsor's engineer or architect certifies that a lesser amount will be necessary to complete the work needed to obtain a permanent Certificate of Occupancy as concerns the Unit, in which case the down payment may be released to Sponsor from the Escrow Account on the Unit closing date. If Sponsor does not have sufficient funds available (based on the architect's certification), through the undisbursed balance of the construction loan, retainage or otherwise, then in lieu of retaining 10% of the purchase price in escrow, Sponsor may deposit with an escrow agent an unconditional, irrevocable letter of credit or post a surety bond in the amount certified by the architect to be necessary to obtain the permanent certificate of occupancy for the Unit. In the event Sponsor desires to post a bond pursuant to this paragraph, prior to posting such bond Sponsor will file an amendment to the Plan disclosing same."

Ex. A at 65-66.

28. As reflected in the Offering Plan, the total value of Wythe Associates' offering initially totaled $19,702,159.00, which, based on amendments to the Offering Plan, was increased. Accordingly, Wythe Associates was required to retain at least $1,970,159.90 in a special escrow account to provide capital to pay costs incurred or that would need to be incurred in furtherance of obtaining a PCO for the Building.

### iii.   General Obligations

29. The Offering Plan provides for a few general obligations relevant to this dispute.

30. *First*, the Offering Plan expressly provides that Wythe Associates' PCO and escrow requirements survive the delivery of the deed. *See* Ex. A at 66 ("All representations under the Offering Plan, all obligations pursuant to the New York General Obligations Law, and such additional obligations under the Offering Plan which are to be performed subsequent to the First Unit Closing will survive delivery of the deed.").

31. *Second*, the Offering Plan provides that Stephanie Eisenberg and Paul Eisenberg – as Wythe Associates' principals – are jointly and severally liable for certain breaches under the Offering Plan. *See* Ex. A at 271-72. ("We jointly and severally certify that the Plan does, and that documents submitted hereafter by us which amend or supplement the Plan will . . . not contain any representations or statement which is false, where we: knew the truth, with reasonable effort could have known the truth, made no reasonable effort to ascertain the truth, or did not have knowledge concerning the representation or statements made.").

32. *Third*, the Offering Plan provides that any conflict between it and the Purchase Agreement (described below) will be resolved in favor of the Offering Plan. Ex. A at 51-52.

### c. Defendants Willfully Breached their Obligations to Procure a PCO for the Building and Violated New York Law

33.    In the first few years after the First Unit Closing, Defendants conveyed to unitholders that there would be some delay in finalizing the PCO. During that period of time, many unitholders added mezzanines to their condominiums because Defendants told unitholders that they would be able to incorporate the additional square footage added by the mezzanines into the PCO application.

34.    During the twenty-four year period since the First Unit Closing, Wythe Associates applied for and obtained thirteen TCOs for the Esquire Building, all of which have since expired:

- TCO No. 301092706-10 (effective from January 8, 2004 to April 8, 2004)

- TCO No. 301092706-11 (effective from April 30, 2004 to July 30, 2004)

- TCO No. 301092706-12 (effective from July 28, 2004 to October 26, 2004)

- TCO No. 301092706T019 (effective from December 14, 2006 to March 14, 2007)

- TCO No. 301092706T020 (effective from June 21, 2007 to September 19, 2007)

- TCO No. 301092706T021 (effective from December 5, 2007 to March 4, 2008)

- TCO No. 301092706T022 (effective from March 11, 2008 to June 9, 2008)

- TCO No. 301092706T023 (effective from June 16, 2008 to September 14, 2008)

- TCO No. 301092706T024 (effective from October 13, 2009 to January 11, 2010)

- TCO No. 301092706T025 (effective from January 5, 2011 to April 5, 2011)

- TCO No. 301092706T026 (effective from May 25, 2011 to July 24, 2011)

- TCO No. 301092706T027 (effective from November 10, 2011 to January 9, 2012)

- TCO No. 301092706T028 (effective from May 16, 2012 to July 15, 2012).

35.    Since July 15, 2012, the building has been without *any* certificate of occupancy (temporary or otherwise).

36.    NYC Administrative Code § 28-118.1 states: "No building or open lot shall be used or occupied without a certificate of occupancy issued by the commissioner." Accordingly, for the past *thirteen years*, the many residents of the Esquire Building have occupied their units in violation of the law because of Defendants' breaches and misconduct.

37.    During this thirteen year period, Defendants have repeatedly represented to all unitholders that all work necessary to secure a PCO would be completed. Between 2012 and 2021, Defendants repeatedly represented to unitholders that the process of securing the PCO was far along, and that they just needed a bit more time.

38.    The very first written update about the PCO from the Eisenbergs was not provided until Apil 2021.

39.    Indeed, in response to the many inquiries regarding the inability to secure a PCO for the Esquire Building, Defendants have repeatedly shifted responsibility to the NYC Department of Buildings (the "NYC DOB"), claiming that it lost historical building plans.

40.    By May 2021, frustration with Defendants from unitholders reached a boiling point. On May 18, 2021, the Board of Managers of the Esquire Building (the "Esquire Board") wrote to the New York Attorney General, outlining Defendants failure to comply with both New York law and the plain terms of the Offering Plan. A true and correct copy of this letter is attached as Exhibit C.

41.    That letter provided a timeline of the Board's attempts to obtain Defendants' compliance with New York law. *Id.* at 3.

42.     On January 28, 2022, the New York Attorney General filed a petition to compel compliance with an investigatory subpoena against Wythe Associates. A true and correct copy of this petition is attached as Exhibit D.

43.     Despite the escalation of these issues over the past four years, Defendants have made no progress towards fulfilling their contractual obligations to secure a PCO for the Esquire Building.

### d. Defendants' Breached their Obligation to Fund a PCO Escrow Account under the Offering Plan in Violation of New York Law

44.     As described above, under the Offering Plan, Wythe Associates was required to establish and maintain a special escrow account to hold all deposits and down payments received from unit purchasers for any sales that closed before the Esquire Building received the PCO. The Offering Plan specifies that these funds must remain in escrow until a PCO is obtained, unless and until a Wythe Associates' engineer or architect certifies that a lesser amount is sufficient to complete the remaining work, or unless the Wythe Associates provides alternative collateral acceptable to the New York State Department of Law.

45.     The purpose of the escrow requirement was to ensure the availability of sufficient funds to complete essential work on the Esquire Building's public areas and systems necessary for issuance of the PCO—particularly in light of known regulatory and construction issues, including fire safety, ADA compliance, and zoning violations.

46.     Despite these clear contractual obligations, Wythe Associates *never* established a PCO escrow account. Nor did it ever submit a certification from an engineer or architect justifying release of funds, as contemplated by the Offering Plan. Nor did it post a letter of credit, surety bond, or any other form of collateral.

47.     On April 3, 2021, counsel for Defendants admitted in writing to the Esquire Board's counsel that no escrow account had been established and that none would be created.

48.     Upon information and belief, at no point during the Class Period did Wythe Associates ever fund an escrow account, deposit acceptable collateral, or obtain a qualifying engineer or architect certification to justify release of purchaser deposits. These failures constitute a clear breach of the Offering Plan and deprived unit owners of the financial safeguards required for lawful completion of the project.

49.     In addition to violating its contractual obligations under the Offering Plan, Wythe Associates has violated multiple provisions of New York State law governing condominium conversions and the handling of purchaser funds.

50.     New York General Business Law ("GBL") § 352-e(2-b) requires that "all deposits, down-payments or advances made by purchasers of residential units shall be held in a special escrow account pending delivery of the completed apartment or unit and a deed or lease."

51.     GBL § 352-h reinforces that these purchaser funds "shall continue to be the money of the person making such purchase, deposit or advance," must be "held in trust," and "shall not be commingled with the personal moneys or become an asset of" the sponsor or its affiliates unless and until properly released upon consummation of the transaction. *See also* 13 NYCRR § 20.3(o).

52.     Furthermore, 13 NYCRR § 20.3(o)(2–7) requires that all deposits and down payments received prior to closing be governed by a written escrow agreement between the sponsor, the purchaser, and the escrow agent. No such compliant agreements were ever executed or disclosed by Wythe Associates.

53.     Most critically, 13 NYCRR § 20.3(t)(13)(ii) provides that where a condominium unit is sold prior to the issuance of a PCO, the sponsor must:

12

- maintain all deposits in the special escrow account required by GBL § 352-e(2-b), unless a certification from an engineer or architect establishes that a lesser amount is needed; and

- in the alternative, deposit an irrevocable letter of credit, post a surety bond, or provide other collateral acceptable to the Department of Law.

54.    None of these conditions were satisfied. Upon information and belief, Defendants instead misappropriated purchaser deposits, commingled funds with personal accounts, and used the funds to pay construction costs and other expenses unrelated to the purposes permitted under law.

55.    These violations of the GBL and 13 NYCRR reflect not mere technical noncompliance, but a wholesale disregard for consumer protection regulations designed to ensure that purchasers do not bear the risk of defective or incomplete development. Had a proper escrow been established as required, sufficient funds would have been available to complete essential work and obtain a PCO.

### e. Unitholders Take Action to Remove Defendants From Their Involvement in the Esquire Buildings' Operations

56.    As tensions mounted concerning Defendants' failures to obtain a PCO, unitholders in the Esquire Building took steps to remove Defendants Paul Eisenberg and Stephanie Eisenberg from the Esquire Board.

57.    On March 8, 2021, a meeting of unit owners was held, during which Paul Eisenberg was not re-elected to the Esquire Board. Prior to that point in time, one of either Stephanie or Paul Eisenberg were continuously on the Board since the Offering Plan first established the Esquire Board.

58.    Once Paul was removed, the Esquire Board began to take steps to scrutinize Defendants' management of the Esquire Building's finances. Prior to that point in time, Wythe Associates had served as the Condominium's Managing Agent with full control of all books,

13

records, and related documents. Despite numerous requests by the Esquire Board, as of the date of this Complaint, Wythe Associates has failed to provide information pertaining to the condominium's finances, notwithstanding the Board's indisputable right to access such books and records.

59.    Under new leadership, the Esquire Board has taken steps over the past four years to attempt to peacefully resolve the issues with Defendants. Defendants have responded to these efforts with increased hostility, at times threatening to withhold the common charges they owed to the condominium by virtue of their ownership interests in order to improperly gain leverage in negotiations.

60.    At the insistence of many unitholders, on June 3, 2025, Paul Eisenberg held a meeting to provide an update on the PCO status. During that meeting, he delivered an opaque description of the status of Defendants' PCO efforts, and when his presentation was over, he immediately shut down the Zoom meeting in order to avoid answering questions that were posed to him by other unitholders.

61.    Plaintiff brings this action to bring an end to Defendants' lawless behaviors.

## V.    CLASS INJURY AND STANDING

62.    Plaintiff and each class member have suffered injury that flow from Defendants' breaches of the Offering Plan, principally their failure to obtain a PCO for the Esquire Building.

63.    Plaintiff and each class member allege that Defendants' conduct has caused them substantial financial harm, including: (a) loss of lawful occupancy rights; (b) devaluation of their units, including those who have sold their units and suppressed prices; (c) loss of rental income; (d) inflated interest rates on mortgages due to banks charging more given the legal status of the Esquire Building; (e) out-of-pocket costs for regulatory compliance and halted construction; (f)

14

issuance of stop work orders and exposure to legal liabilities; (g) diminished utility, habitability, and marketability of their property; and (h) increased cost of insurance.

64.    Defendants' breaches of contract have directly caused this injury to Plaintiff and each class member. Plaintiff and each class member are naturally motivated to enforce their contractual rights because they had and have the natural economic self-interest in performance of the contract and recovery of damages caused by the breaches.

65.    In addition, Defendants' fraudulent misrepresentations and omissions caused independent and compounding injuries. Plaintiff and the class members relied on false assurances that the Esquire Building was compliant or would soon be compliant with legal regulatory requirements—including representations that unit renovations could proceed and would be covered under a future PCO. These misstatements induced class members to purchase units, undertake renovations, and remain in the Esquire Building under materially false pretenses.

66.    Defendants' deception had led to the issuance of stop work orders, exposure to liability, regulatory enforcement, and loss of use and enjoyment of the premises. Plaintiff and each class member were deprived of material information necessary to make informed decisions about their real estate investments and occupancy rights. This reliance-based harm is distinct from economic losses caused by the contract breaches and further supports standing under common law fraud principles.

## VI.    CLASS ALLEGATIONS

67.    Plaintiff brings this action on behalf of himself and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of all persons who purchased units in the Esquire Building from the First Unit Closing in November 2001 to the present (the "Class").

68.    This Class excludes (i) Defendants and (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

69.    Plaintiff reserves the right to amend this Class definition if further investigation, discovery, or both indicate that such definition should be narrowed, expanded, or otherwise modified.

70.    The members of the Class are so numerous that joinder of all members is impracticable. The precise number of members of the Class is unknown to Plaintiff at this time, but it is believed to be more than 75.

71.    Defendants have acted on grounds that apply generally to the members of the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

72.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Such common issues include:

(a) Whether Defendants breached the terms of the Offering Plan under New York law in failing to obtain a PCO or else failing to maintain a TCO;

(b) Whether Defendants breached the terms of the Offering Plan under New York law by failing to fund a PCO Escrow Account;

(c) Whether funds intended for escrow were systematically converted to Defendants' own use rather than held in trust;

(d) Whether Defendants made material misrepresentations or omissions regarding the legal status of the Esquire Building, availability of certificates of occupancy, or permissibility of renovations;

(e) Whether Defendants' conduct constituted fraud under New York law;

(f) Whether class members relied on misrepresentations by Defendants in purchasing units or undertaking renovations;

(g) The extent of damages suffered by Plaintiff and the Class; and

(h) The appropriate injunctive, declaratory, and monetary relief to be awarded to the Class.

73. Plaintiff's claims are typical of the claims of the other members of the Class he seeks to represent. Defendants' practices have targeted and affected all members of the Class in a similar manner.

74. Plaintiff will continue to fully and adequately protect the interests of the members of the Class.

75. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

76. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.

77. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

78. The interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

17

### VII.    CLAIMS FOR RELIEF

**COUNT I**
**Breach of Contract – Offering Plan**
**(Against Wythe Associates)**

79.    Plaintiff incorporates the allegations above.

80.    Plaintiff and members of the putative class are current or former unit owners in the Esquire Building.

81.    The Offering Plan constitutes a binding contract between Wythe Associates and each purchaser of a unit in the Esquire Building. Each unit purchaser also entered into a Purchase Agreement that expressly incorporates the terms of the Offering Plan by reference, rendering those terms enforceable obligations of the Defendants.

82.    Pursuant to the Offering Plan, Defendants were contractually obligated to: (a) obtain a PCO for the building within two years of the First Unit Closing or to continuously maintain a TCO pending issuance of the PCO; (b) fund and maintain a special escrow account in accordance with GBL § 352-e(2-b) and 13 NYCHR 20.3(t)(13) for unit closings that occurred prior to issuance of a PCO; (c) use all purchaser deposits and down payments for their intended purposes and not remove them from escrow prior to PCO issuance without proper certification or collateral; and (d) complete all authorized and proper work necessary to construct, establish, and sell the condominiums in compliance with the Offering Plan.

83.    Defendants have materially breached each of these obligations. Specifically, Defendants have: (a) failed to obtain a PCO more than *two decades* after the First Unit Closing; (b) allowed all TCOs to lapse, with the last expiring on July 15, 2012; (c) never funded the required PCO escrow account; (d) failed to provide the Esquire Board or purchasers with either an architect's certification necessary to release escrow funds or provide other lawful collateral; (e) improperly diverted escrowed purchaser funds for other uses; and (f) misrepresented the feasibility

of obtaining a PCO despite knowing that numerous DOB objections—including zoning, ADA compliance, and fire safety—rendered compliance effectively impossible without substantial structural changes.

84.    Plaintiff and members of the Class have fully performed their obligations under the Offering Plan.

85.    As a direct and proximate result of Defendants' breaches, Plaintiff and the Class have suffered substantial damages, including but not limited to: (a) loss of lawful occupancy rights; (b) devaluation of their units, including those who have sold their units and suppressed prices; (c) loss of rental income; (d) inflated interest rates on mortgages due to banks charging more given the legal status of the Esquire Building; (e) out-of-pocket costs for regulatory compliance and halted construction; (f) issuance of stop work orders and exposure to legal liabilities; (g) diminished utility, habitability, and marketability of their property; and (h) increased cost of insurance.

86.    Plaintiff and the Class are entitled to compensatory damages in an amount to be determined at trial, and to any other relief the Court deems just and proper.

## COUNT II
### Unjust Enrichment
### (Against Stephanie Eisenberg and Paul Eisenberg)

87.    Plaintiff incorporates by reference all allegations set forth above.

88.    Plaintiff and members of the putative class are current or former unit owners in the Esquire Building who paid deposits, down payments, or other funds to Wythe Associates in reliance on the representations and obligations set forth in the Offering Plan and Purchase Agreements.

19

89.    Under the Offering Plan, Defendants were required to maintain purchaser deposits and down payments in a special escrow account pursuant to General Business Law § 352-e(2-b) and 13 NYCRR § 20.3(t)(13), pending issuance of a PCO, unless properly certified or collateralized in accordance with law.

90.    Upon information and belief, Paul Eisenberg and Stephanie Eisenberg, acting in their capacities as principals of Wythe Associates and as controlling persons, caused purchaser funds to be diverted from the required escrow account, or withheld from escrow altogether, and instead used or distributed such funds for their personal benefit or to fund other obligations unrelated to the escrow's lawful purpose.

91.    These distributions allowed the Eisenbergs to personally profit from unit sales and escrow proceeds while circumventing the statutory and contractual safeguards designed to protect unit owners and ensure completion of essential regulatory work for the Esquire Building.

92.    This enrichment came at the direct expense of Plaintiff and the Class, who were deprived of the escrow reserves that would have funded the work required for PCO issuance. Instead, unit owners have borne the financial and regulatory burdens of the Eisenbergs' failure to comply with the Offering Plan and applicable law.

93.    At no time did the Eisenbergs provide the required certification from an architect or engineer that would have permitted release of the funds, nor did they post collateral or otherwise comply with the alternative conditions necessary to lawfully access or distribute purchaser funds.

94.    As a result, Paul and Stephanie Eisenberg were unjustly enriched through the misappropriation and diversion of purchaser deposits, while Plaintiff and the Class were correspondingly impoverished through loss of the protections and value those funds were intended to secure.

95.     It would be against equity and good conscience to allow the Eisenbergs to retain the benefits of these distributions when those benefits were derived through self-dealing and in direct violation of their obligations as fiduciaries, principals of Wythe Associates, and agents of escrow administration.

96.     Plaintiff and the Class are entitled to restitution in the amount of all purchaser funds improperly diverted or distributed by the Eisenbergs in violation of escrow requirements, together with interest and any other equitable relief the Court deems just and proper.

## COUNT III
### Fraud
### (Against all Defendants)

97.     Plaintiff incorporates by reference all allegations set forth above.

98.     Defendants Wythe Associates, Stephanie Eisenberg, and Paul Eisenberg engaged in a deliberate fraudulent scheme to induce Plaintiff and the putative class to purchase units in the Esquire Building under materially false pretenses.

99.     Defendants Stephanie and Paul Eisenberg intentionally misrepresented and omitted material facts in their Offering Plan, amendments, and other communications to purchasers. These included: (a) repeatedly representing that a PCO would be obtained shortly after the First Unit Closing despite knowing this was untrue; (b) representing that purchaser renovations would be permissible and later legalized under the PCO despite knowing this was untrue; (c) failing to disclose the existence of structural and regulatory violations that rendered PCO issuance effectively impossible; (d) representing that purchaser down payments would be held in escrow until a PCO was obtained and in accordance with the law despite knowing they would withdraw escrowed funds without obtaining proper certification; and (e) hiding that the NYC DOB had lost essential building plans from unit owners and purchasers, further preventing PCO approval.

100.    These representations and omissions were knowingly false or made with reckless disregard for the truth.

101.    Internal communications and representations to government regulators reveal that the Defendants were aware of the DOB's longstanding objections, including FAR violations, fire code deficiencies, and ADA noncompliance, that would require substantial demolition or reconfiguration.

102.    Plaintiff and other Class members relied on Defendants' misrepresentations in deciding to purchase units, invest in renovations, and reside in the Esquire Building under the belief that it would soon be legally compliant.

103.    As a direct and proximate result of the Defendants' conduct, Plaintiff and the Class have suffered damages, including but not limited to: (a) loss of lawful occupancy rights; (b) devaluation of their units, including those who have sold their units and suppressed prices; (c) loss of rental income; (d) inflated interest rates on mortgages due to banks charging more given the legal status of the Esquire Building; (e) out-of-pocket costs for regulatory compliance and halted construction; (f) issuance of stop work orders and exposure to legal liabilities; (g) diminished utility, habitability, and marketability of their property; and (h) increased cost of insurance.

104.    The Defendants' conduct was intentional, malicious, and undertaken with conscious disregard of Plaintiff's rights, entitling Plaintiff to compensatory damages in an amount to be determined at trial.

## COUNT VI
### Breach of Fiduciary Duty
### (Against all Defendants)

105.    Plaintiff incorporates by reference all allegations set forth above.

22

106.    At all relevant times, Stephanie and Paul Eisenberg controlled Sponsor Wythe Associates, which served as the Building's Managing Agent from 2001 to present.

107.    Paul Eisenberg served on the Board until March 8, 2021, when he was not re-elected by Residential Unit Owners.

108.    As controlling persons of the Managing Agent and former Board members, Defendants Stephanie and Paul Eisenberg maintained operational control over the Esquire Building's finances, construction decisions, and regulatory interactions, acting to their own benefit and to the detriment of Plaintiff.

109.    In these capacities, Defendants owe or previously owed fiduciary duties of loyalty, care, and full disclosure to the condominium and all unit owners, including Plaintiff and the putative Class.

110.    These fiduciary duties required them to act in good faith, to prioritize the best interests of the unit owners over their own financial interests, and to fully and fairly disclose all material facts relating to the administration and legal status of the Esquire Building.

111.    Thus, as described above, Defendants knowingly and improperly, among other things, failed to disclose to the Esquire Board and to unit owners various serious structural and regulatory issues known by Defendants to be necessary for the issuance of a PCO; failed to arrange for the performance of such items of repair and renovation needed for issuance of a PCO in a timely fashion or for the continuous maintenance of a TCO; commingled funds required to stay in escrow with funds held on behalf themselves and other entities and persons; failed to turn over critical information pertaining to the condominium's operations and finances to the Board; misled unit owners into investing in renovations under false pretenses — all to the detriment of the

23

Plaintiff, the Board of Managers and the members of the Class, and for the benefit of the Defendants.

112.    These breaches of duty were committed while the Defendants were in a position of trust and control and were motivated by self-interest, including to increase unit sales, minimize their liability, and personally benefit from misappropriated resources and retained units.

113.    Accordingly, Defendant Wythe Associates is liable to the Plaintiff for breaching its fiduciary duties as Managing Agent, and Defendants Stephanie and Paul Eisenberg are jointly and severally liable, as members of the Esquire Board and as conspirators, for Defendant Wythe Associates' breaches of its fiduciary duties to Plaintiff as set forth above.

114.    As a direct and proximate result of these breaches, Plaintiff and members of the proposed class have suffered significant harm, of an amount to be proven at trial, for which sum said Defendants are jointly and severally liable to said Plaintiff. These harms include: (a) loss of lawful occupancy rights; (b) devaluation of their units, including those who have sold their units and suppressed prices; (c) loss of rental income; (d) inflated interest rates on mortgages due to banks charging more given the legal status of the Esquire Building; (e) out-of-pocket costs for regulatory compliance and halted construction; (f) issuance of stop work orders and exposure to legal liabilities; (g) diminished utility, habitability, and marketability of their property; and (h) increased cost of insurance.

115.    Plaintiff and the proposed class are entitled to compensatory damages, disgorgement of any unjust gains or improperly retained units, and any other equitable or legal relief the Court deems appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

24

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as class counsel;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

(c) Award compensatory damages to Plaintiff and the proposed class in an amount to be established at trial;

(d) Award punitive damages in an amount to be established at trial;

(e) Award pre- and post-judgment interest;

(f) Award reasonable attorneys' fees and costs;

(g) That the Court award Plaintiff a permanent injunction requiring it to transfer sufficient funds to an escrow account and ordering that the Esquire Board take over all efforts related to the Esquire Building's PCO efforts; and

(h) Award any other and further relief as may be just and proper.

Respectfully submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Velvel Freedman*
Velvel Freedman
Freedman Normand Friedland LLP
1 SE 3rd Ave., Suite 1240,
Miami, FL 33131
Tel: (646) 494-2900
vel@fnf.law